(No. 33156.—

THE PEOPLE *ex rel.* Community High School District No. 231, Petitioner, *vs.* LAWRENCE L. HUPE, School Treasurer, Respondent.

*Opinion filed March 17, 1954.*

HAROLD W. NORMAN, ALLYN J. FRANKE, and JOHN LIGTENBERG, all of Chicago, for petitioner.

KLEIN & THORPE, of Chicago, for respondent.

Mr. Justice Daily delivered the opinion of the court:

In the public interest and because of the urgency of the cause, we have granted leave to the People, acting on the relation of Community High School District No. 231 of Cook County, (hereafter referred to as petitioner,) to file an original petition for writ of *mandamus* directing the respondent, Lawrence L. Hupe, treasurer for said district, to register, number and countersign bonds totalling $1,100,000, which relator has been lawfully authorized to issue, as he is required to do by section 19-7 of the School Code. (Ill. Rev. Stat. 1953, chap. 122, par. 19-7.) Respondent has refused to execute bonds in excess of $516,000 on the ground that such figure is the limit of relator's debt-incurring power.

Respondent's refusal is predicated on section 12 of article IX of the Illinois constitution as it is implemented by section 19-33 of the School Code. (Ill. Rev. Stat. 1953, chap. 122, par. 19-33.) The mandate of the constitutional provision is, that "No county, city, township, school district, or other municipal corporation, shall be allowed to become indebted in any manner or for any purpose, to an amount, including existing indebtedness, in the aggregate exceeding five per centum on the value of the taxable property therein, * * *." As regards school districts, section 19-33, as amended in 1953, (Laws of 1953, p. 1369,) ordains the following:

"§ 19-33. In computing the debt incurring power of any school district where there has been included in any such school district only a part of any former school district which at the time of such inclusion has outstanding bonded indebtedness, a proportionate amount of such bonded indebtedness shall be chargeable to such school district based upon the ratio that the assessed valuation of taxable property as equalized and determined by the State Department of Revenue in that part of the territory of such former school district that has been included in any such school

district bears to the total assessed valuation of the said former school district as equalized and determined by the State Department of Revenue for the year in which the change occurred, and said proportionate amount of such bonded indebtedness shall be chargeable against such school district in determining its debt incurring power."

The facts which draw the foregoing provisions into the cause disclose that the petitioner was organized as the result of an election called by the county superintendent of schools on April 19, 1952, under the provisions of sections 10-9 and 10-10 of the School Code, (Ill. Rev. Stat. 1951, chap. 122, pars. 10-9 and 10-10,) and that it was formed entirely out of territory comprising a part of Non-High School District No. 216 of Cook County. Since its organization, the petitioner, having no school buildings, has incurred a debt of $200,000 for tuition; however, by elections held April 11 and October 10, 1953, and by proper board action in January, 1954, petitioner has been authorized to issue bonds totalling $1,100,000 for the purpose of purchasing a site and erecting a school building. The 1952 equalized assessed valuation of the taxable property in the territory which forms petitioner's district was $26,957,960; thus if the constitutional provision alone is controlling, petitioner has a debt-incurring power of $1,347,898 less the $200,000 indebtedness for tuition, or $1,147,898, and the issuance of $1,100,000 of bonds would not violate the constitution.

At the time petitioner was organized, however, Non-High School District 216, of whose territory only a part was taken to create the petitioner, had a bonded indebtedness of $2,808,000 (since reduced to $2,518,000,) and the paramount question here is whether section 19-33 operates to make a portion of such indebtedness chargeable to petitioner's debt-incurring power. The 1952 equalized assessed valuation of the taxable property in District 216 was $107,424,990 while, as previously stated, that of petitioner

was $26,957,960, or 25.094 per cent of District 216's valuation. If section 19-33 is applicable, and interpreted literally, the result would be that relator's debt-incurring power would be charged with $631,780 of District 216's bonded indebtedness and would thus reduce petitioner's 5 per cent debt limit to $516,000, the figure beyond which respondent refuses to execute bonds. Petitioner contends that section 19-33 does not apply in this case, while the position of respondent is exactly to the contrary.

It is common knowledge that since 1945, Illinois has been engaged in a comprehensive reorganization of its school system to the end that a more efficient system of schools be provided. One of the important features of the program, as reflected by the reports of the School Problems Commission and by subsequent legislation, has been a studied attempt to eliminate non-high school districts wherever and whenever possible, (See: Ill. Rev. Stat. 1951 and 1953, chap. 122, article 11,) a non-high school district consisting of territory which is not in a high-school district or a district maintaining a recognized four-year school. It maintains no educational facilities of its own and its only function is to provide funds to pay the high-school tuition of its eighth grade graduates. (Ill. Rev. Stat. 1953, chap. 122, par. 11-1.) Inasmuch as petitioner was formed out of non-high school territory, thus having the effect of partially eliminating a non-high school district, this expressed purpose of the school administrators and legislators is relied upon heavily by petitioner as a basis for its contention that section 19-33 does not apply to school districts which include a part of a non-high school district.

One of the problems which has beset the reorganization of the school system has been that of fixing liability for existing indebtedness where two districts are consolidated or where a part only of one district is annexed to another. While there appears to be no question that petitioner did not, in this case, become liable for any of the bonded in-

debtedness of District 216, petitioner's arguments that a proportionate share of such debt is not chargeable to petitioner's debt-incurring power requires some consideration of the manner in which the problem of debt liability has been treated by the legislature.

In the absence of statutory provisions the established rules are, first, if two or more municipal corporations are consolidated or the entire territory of one municipal corporation is annexed to another, the indebtedness of both becomes the indebtedness of the consolidating or annexing corporation (*Kocsis* v. *Chicago Park District,* 362 Ill. 24; *People ex rel. Moore* v. *Chicago, Burlington and Quincy Railroad Co.* 414 Ill. 419;) and, second, if only a part of one municipal corporation is annexed to another or created into a new municipal corporation, the one to which territory is annexed, or the new corporation formed, does not become liable for any part of the debt of the corporation from which territory has been taken, the latter remaining liable on its indebtedness as though there had been no change in its boundaries. *People ex rel. Hagler* v. *Chicago, Burlington and Quincy Railroad Co.* 380 Ill. 120, p. 127; *People ex rel. Raymond Community High School Dist.* v. *Bartlett,* 304 Ill. 283, p. 286.

The only provisions in the School Code prior to 1949 which modified the general rules were sections 19-9, 19-30, and 19-31. (Ill. Rev. Stat. 1947, chap. 122, pars. 19-9, 19-30, and 19-31.) Section 19-9 provided that the county clerk should extend taxes against all taxable property in any school district, with a population of less than 500,000, *as of the date of the registration of the bonds,* in amounts sufficient to pay the principal and interest thereon. Sections 19-30 and 19-31 implemented section 19-9. The effect of the three sections was to confirm the general rule as to detachments of parts of school districts but to change the rule when an entire district was taken into or consolidated with another. This court so construed section 19-9 in

*Spence* v. *Selcke*, 404 Ill. 98, where it was held that no change in the boundaries of a school district, whether a detachment or a consolidation, affected the liability on existing bonded indebtedness. In 1949, presumably in anticipation of the *Spence* decision, the legislature added section 19-32 to the School Code, providing that upon the creation of any consolidated school district, community unit district or school district organized under the School Survey Act, (Ill. Rev. Stat. 1949, chap. 122, pars. 713 to 732,) the new districts would assume the bonded indebtedness of all the underlying school districts *wholly included* within their boundaries. By implication, this direction of the legislature removed the restrictive effect of section 19-9 on the types of districts embraced by section 19-32. At the same time, the General Assembly enacted section 19-33 as a companion measure, providing that where newly created community unit districts or School Survey Act districts included *a part only* of a former district which then had an outstanding bonded indebtedness, a proportionate amount of such indebtedness was chargeable against the debt-incurring power of the new district. These sections were construed and withstood constitutional attack in *McLain* v. *Phelps*, 409 Ill. 393.

In 1951, the legislature further treated upon the matter of the assumption of bonded indebtedness when it added section 4B-12 to the School Code. (Ill. Rev. Stat. 1951, chap. 122, par. 4B-12.) This section, which expressly applied only to boundary changes accomplished by the action of the newly created county boards of school trustees in the manner required by article 4B of the School Code, provided as follows:

"§ 4B-12. Unless otherwise provided in this Article whenever the boundaries of any school district, other than a non-high school district, are changed by the detachment of territory from one district and the annexation thereof to another school district or the dissolution of a district

and its annexation to another district under any of the provisions of this Article the district as it exists on and after the change of boundaries shall assume the bonded indebtedness of the original annexing district and the liability for the bonded indebtedness of any territory so annexed. The tax rate for such indebtedness shall be determined in the manner provided in Section 19-9 of this Act."

While this section did not, by its terms, apply to districts newly created in the manner provided for in sections 10-9 and 10-10, as was the petitioner, it becomes important because it is the exclusionary language relating to non-high school districts and a later amendment to the section, upon which petitioner predicates its claim that section 19-33 has no application when the boundary changes which occur affect non-high school territory. Applying the contention to the facts of his case, petitioner insists that because its territory was taken from a non-high school district (District 216), it is not chargeable, under section 19-33, with a proportionate share of the non-high school district's bonded indebtedness in computing its debt-incurring power.

The amendments to the School Code which give rise to petitioner's contention were contained in House Bill No. 76, as passed in 1953 by the sixty-eighth General Assembly, (Laws of 1953, pp. 1368-1369,) wherein sections 19-30, 19-31 and 19-32 were repealed and sections 4B-12, 19-9 and 19-33 were amended. As amended, section 4B-12 now provides as follows:

"§ 4B-12. Whenever a new district is created or the boundaries of any school district, other than a non-high school district, are changed by the annexation or detachment of territory or by the dissolution of a district and its annexation to another district under any of the provisions of this Act each such district as it exists on and after such action shall assume the bonded indebtedness of all the territory included therein after such change. The tax rate

for such indebteness shall be determined in the manner provided in Section 19-9 of this Act, except the County Clerk shall anually extend taxes against all the taxable property situated in the county and contained in each such district as it exists after the action. When the territory of any non-high school district shall be annexed in the manner provided by any of the provisions of the School Code to any district having a bonded indebtedness, such non-high school territory shall remain liable for its bonded indebtedness and become liable for its proportionate part of the, bonded indebtedness of such annexing district." Ill. Rev. Stat. 1953, chap. 122, par. 4B-12.

Thus it may be seen that instead of being applicable only to boundary changes occurring under the provisions of article 4B, section 4B-12 was amended to apply whenever a new school district is created or the boundaries of any school district changed under any of the provisions of the School Code. This enlargement of the scope of section 4B-12 beyond the provisions of article 4B eliminated what would have become duplicating provisions in section 19-32, which was repealed.

In like manner section 19-33, as previously quoted at the beginning of this opinion, was amended to make it applicable to the computation of the debt-incurring power of "any school district" in which there is included only a part of any former school district which, at the time of such inclusion, had an outstanding bonded indebtedness. Unlike section 4B-12, as amended, this section contains no exclusionary language relative to territory of non-high school districts.

Section 19-9, the third section of the School Code to be affected by House Bill No. 76, was amended to remove the restrictive language which produced the result in *Spence* v. *Selcke,* 404 Ill. 98, and now provides, in part, that: "Whenever any school district having a population of less than 500,000 inhabitants is authorized to issue bonds, the

recording officer thereof shall file in the office of the county clerk of each county in which any portion of the district is situated a certified copy of the resolution providing for their issuance and levying a tax to pay them, * * *, and the county clerk, subject to the provisions of Section 4B-12 of this Act, annually shall extend taxes against all the taxable property situated in the county and contained in the district in amounts sufficient to pay maturing principal and interest, * * *." (Ill. Rev. Stat. 1953, chap. 122, par. 19-9.) It should be noted, too, that this section is made to apply to "any school district" authorized to issue bonds and makes no exception as to non-high school districts or districts formed from non-high school territory. The legislative failure to exclude non-high school districts from this section is not, however, decisive on the question of their intent. Non-high school districts are authorized to issue bonds by four different sections of the School Code (See sections 11-10, 11-12, 19-10 and 19-16,) and the direction to the county clerk to extend taxes on the basis of tax levies filed with him for each of these separate types of bonds are construed in sections 11-11, 11-13, 19-13 and 19-19 of the School Code. It is at least doubtful, therefore, that section 19-9 was intended to apply to non-high school bonds and the section does little to settle the issue between the parties.

Petitioner construes section 4B-12, as amended, as excluding from its purview all boundary changes involving non-high school territory. Although we think the section inartfully drawn, we agree that this conclusion must be reached. When section 4B-12 was originally enacted in 1951 it provided as follows: "* * * whenever the boundaries of any school district, other than a non-high school district, are changed by the detachment of territory from one district and the annexation thereof to another school district * * * the district as it exists on and after the change of boundaries shall assume the bonded in-

debtedness of the original annexing district and the liability for the bonded indebtedness of any territory so annexed. * * *" (Ill. Rev. Stat. 1951, chap. 122, par. 4B-12.) It might be possible to construe this language so that the phrase "other than a non-high school district" would become operative only in the case of annexation "to" and not "from" non-high school districts. However, under such a construction, the phrase would serve only to prevent a non-high school district from having to assume bonded indebtedness of annexed territory. Such a result would be wholly inconsistent with the fact that the legislature did not contemplate the enlargement of non-high school districts but had, rather, established a program for their complete elimination. It must be concluded, therefore, that the phrase "other than a non-high school district" was not intended to describe the district which was to assume the bonded indebtedness, but was intended to specify one kind of boundary changes which did not come within the scope of the section, namely, those involving a non-high school district. This same construction must be carried forward to section 4B-12 as amended in 1953, with the result that a new district is likewise not required to assume the indebtedness of non-high school territory included within its boundaries. We believe this is so despite the fact that section 11-18.2 of the School Code, enacted in 1953, (Laws of 1953, p. 1036,) provides that some non-high school districts may remain as such under certain circumstances, for this section does not contemplate the enlargement of such non-high school districts nor does it alter the legislative plan of eliminating non-high school districts wherever possible.

The concluding sentence of the 1953 amendment to section 4B-12 also serves greatly to remove any doubt as to the legislative intent for it provides that "When the territory of any non-high school district shall be annexed in the manner provided by any of the provisions of the

School Code to any district having a bonded indebtedness, such non-high school territory shall remain liable for its bonded indebtedness and become liable for its proportionate part of the bonded indebtedness of such annexing district." The annexing district and the annexed non-high school territory could not both be liable for the same bonded indebtedness, thus it is to be concluded that the section does not contemplate that a new district is to assume the bonded indebtedness of non-high school territory included within its boundaries.

Aside from the language employed in the section, we believe that there are practical reasons, undoubtedly contemplated by the legislature, which would tend to bring about a legislative policy to relieve other districts from liability on non-high school district bonds. It is to be seen from article 11 of the Code that the only purpose for which non-high school districts may issue bonds is to pay tuition debts. By issuing such bonds instead of paying the cost of tuition from current tax collections, the taxpayers of the district simply defer the payment of its current educational costs to other years. Bonds of an ordinary school district, on the other hand, are usually issued for the purpose of purchasing a school site and erecting school buildings and thus provide physical assets of a corresponding value which will inure to the benefit of the district for many years to come. To create a mutual exchange of bonded debt liability between a district and a part of a district, both of which have incurred their indebtedness to establish permanent educational facilities in their respective districts, is logical and understandable and would, no doubt, be acceptable to the taxpayers involved. It is another matter, however, to ask a district that has, or is to become, indebted for a school site and buildings, to further shoulder a share of the bonded indebtedness of annexed non-high school territory which was incurred for current operating expense rather than permanent benefit to the school system.

Such a condition would serve as a formidable deterrent to the program to eliminate non-high districts, for taxpayers would be loathe to sanction or seek new districts so burdened. For this, and the reasons previously set forth, it is our conclusion that a new district, such as the petitioner, is not required by section 4B-12, either as originally enacted in 1951 or as amended in 1953, to assume the bonded indebtedness of non-high school territory included within its boundaries. There remains, however, the question of whether a proportionate share of such indebtedness is chargeable to the debt-incurring power of the new district.

Petitioner urges that the same reasons which led the legislature to exclude situations involving non-high school districts from the purview of section 4B-12 should operate to exclude them from the provisions relating to the computation of debt-incurring power in section 19-33. Because of this, and because the two sections were amended by the same bill, the petitioner contends that when the sections are construed *in pari materia,* they manifest a legislative intent to carry the exclusionary provision of section 4B-12 into section 19-33. It is argued that if section 19-33 is to be construed as charging operating districts with the bonded indebtedness of non-high school districts, it will be impossible to carry out the program for the elimination of non-high school districts, a result so inconsistent with the legislature's positive program that it could not have been intended. Respondent, while admitting section 4B-12 is to be construed as showing a legislative intent to exclude cases involving non-high school districts from its scope, asserts that if the legislature had likewise intended to exclude situations of the same nature from the application of section 19-33, it would have expressly done so as it did in section 4B-12. In the absence of such express language, it is the respondent's position that section 19-33 must be literally enforced.

When the successive changes which have occurred in school legislation relative to assumption of debt and computation of debt, and the legislative effort to resolve all such questions in House Bill No. 76, are considered in the light of the legislative design to eliminate non-high school districts for the purpose of creating a more compact and efficient school system, it must be said that the question of what the legislature intended by section 19-33 is not free from doubt. If the language of the section is to be literally construed, the result will be that the petitioner's debt-incurring power will be reduced to a figure where it will be unable to furnish educational facilities and the net result will be that petitioner's territory will be back in the same position it was when it was part of the non-high school district. This was certainly not the legislative intent when it laid out a program to eliminate non-high school districts, for the very real purpose of the elimination program is to cause such districts to become an integral part of a district that has, or will· be able to furnish, educational facilities. The legislature demonstrated an awareness of such a situation when it amended section 4B-12 to provide that new districts formed under the act did not assume liability for the bonded indebtedness of non-high school districts, for assumption would, without any question, automatically reduce the debt-incurring power of the new district. It is difficult to conceive that the legislature intended to permit section 19-33 to do indirectly that which it directly sought to prevent in section 4B-12, namely, the burdening of a new district formed out of non-high school territory to the extent that the new district would be unable to establish its own educational facilities. While the bonded indebtedness of all high school districts may not be such as to produce the result in this case, *i.e.,* a reduction of the new district's debt-incurring power to an extent that it cannot erect a proper school building, we may take judicial notice that the petitioner district is not alone in the situation it finds

itself and that the absurd consequences produced by a literal construction of section 19-33 would have a statewide effect of hindering the school reorganization program as a whole.

It is a canon of statutory construction that where the passage of a series of legislative acts results in confusion and consequences which the legislature may not have contemplated, courts must construe the acts in such a way as to reflect the obvious intent of the legislature and to permit practical application of the statutes. (*Scofield* v. *Board of Education,* 411 Ill. 11; *Moyer* v. *Board of Education,* 391 Ill. 156; *York Community High School Dist* v. *Wagemann,* 375 Ill. 193.) Again, we have held that where the literal enforcement of a statute would result in great injustice or absurd consequences, courts are bound to presume that such consequences were not intended and to adopt a construction which, it is reasonable to assume, was contemplated by the legislature. When the legislative intention can be gathered from a consideration of all the legislation on the subject, words of a particular section may be modified or altered so as to obviate all inconsistency with such intention. (*Ketcham* v. *Board of Education,* 324 Ill. 314; *People ex rel. Taylor* v. *Camargo Community Consolidated School Dist.* 313 Ill. 321.) It is also the rule in construing statutes that it is proper to compare statutes relating to the same subject matter and to consider the motives for making the changes in the law and the evils sought to be corrected. (*Anderson* v. *City of Park Ridge,* 396 Ill. 235.) As relates to schools, we have held that although the school law consists of different articles and different sections, it is to be construed as one entire act, (*Greenwood* v. *Gmelich,* 175 Ill. 526,) and it is to be presumed that the several enactments relating to the one subject are governed by one spirit and one policy and that the legislature intended the enactments to be consistent and harmonious. *Ketcham* v. *Board of Education,* 324 Ill. 314.

Demonstrative of the application of the foregoing established principles of statutory construction is the case of *People ex rel. Barrett* v. *Anderson,* 398 Ill. 480, where the legislature, in the Congressional Reapportionment Act of 1947, described certain territory as "the village of Stickney" instead of "the township of Stickney," thus causing all the township outside the village to remain unapportioned. In finding that it was not the intention of the legislature to exclude this territory and in holding that the word "township" should be read into the Act in lieu of the word "village," we stated: (p. 485) "* * * while courts are and should be cautious about adding words, as such, to a statute generally, they will not hesitate to read into the sense of some section or provision a qualifying or expanding expression plainly implied by the general context of the act, which has been palpably omitted and which is necessary to prevent the legislative purpose from failing in one of its material aspects."

Sections 19-33 and 4B-12 both deal with the subject of bonded indebtedness of school districts and, inasmuch as it appears that the over-all purpose for the enactment of House Bill No. 76 was to facilitate and further the program for reorganizing our schools into an efficient, uniform, and fair system, it is apparent that both were intended to be harmonious and consistent with the entire plan for reorganization reflected by the School Code. One part of that plan, as shown by changes incorporated into article 11 of the School Code by the two most recent sessions of the General Assembly (1951 and 1953) is the elimination of non-high school districts. As stated previously, it is not the elimination of such districts which is paramount in such legislation but, rather, that the territory included in such districts becomes a part of a district having, or which will furnish, school facilities. If section 19-33 is to be literally construed to the extent that new districts created out of non-high school territory are pre-

vented from providing the needed educational facilities, then the purpose of the legislature to provide an efficient school system will fail in a material aspect and residents of the territory affected will have accomplished no more than to create a new board to administer the payment of tuition for their children.

The consequences discussed were expressly avoided by the legislature in section 4B-12 and it is to be presumed that it was not intended section 19-33, which was enacted in the same bill with the same spirit and policies in view, should operate to restrict or prevent the creation of new districts out of non-high school territory. We hold, therefore, that to give consistency and harmony to the end that the school reorganization program may continue rapidly and successfully, there must be read into section 19-33 the same intention to exclude situations involving the creation of new districts out of non-high school territory that was manifested in section 4B-12.

Such a construction creates the probability that the territory taken to form the petitioner will be subject to the bonded indebtedness of both the old and the new districts, the total of which will likely exceed 5 per cent of the valuation of the taxable property in such territory. However, as fully explained in *McLain* v. *Phelps,* 409 Ill. 393, this does not violate the constitution, for its prohibition is against the individual or separate school district from becoming indebted in excess of five per centum.

In view of the result we have reached, discussion of further attacks made by petitioner on section 19-33 becomes unnecessary. Therefore, the writ of *mandamus* is awarded as prayed for, commanding the respondent forthwith to register, number and countersign the bonds authorized by the Board of Education of Community High School District Number 231, Cook County, Illinois, in the manner previously described, when such bonds have been issued and signed by the president, secretary, and two members of the said board of education.       *Writ awarded.*